UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | No.   21-cr-275 (ABJ) |
| **James Matthew Horning** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Mr. Horning is a 46 year old man who has already suffered in many ways as a result of his conduct. He has not only suffered as result of collateral consequences he has experienced, he has also been in a constant state of anguish since being arrested for the instant offense. As a result, his mental health has declined in the past two years.

Mr. Horning has had to overcome many challenges in his past and despite those obstacles and the collateral consequences he faced as a result of this case, he was able to create his own business so that he could provide for his family. Mr. Horning's family means everything to him and he has been focused on supporting them for the past two years. He has completely distanced himself from the events of January 6, 2021.

On January 6, 2021, Mr. Horning was one of the least culpable individuals who entered the Capitol building that day. He was not violent or aggressive, had no confrontation with law enforcement, and did not enter into any sensitive areas.

1

When looking at his specific conduct on January 6, 2021, and the rest of the 3553(a) factors, a period of incarceration followed by 1 year of supervised release as probation suggests is not warranted. *See* ECF No. 44. Given the fact that Mr. Horning has been on supervision already for two years, he respectfully requests that the Court consider a short period of incarceration with no term of supervision to follow. Undersigned counsel submits that Mr. Horning has been more than specifically deterred, especially given the harsh collateral consequences he has experienced as a result of his conduct.

## **BACKGROUND**

On October 6, 2022, Mr. Horning entered a guilty plea to one count of Entering and Remaining in a Restricted Building and Grounds, in violation of 18 USC §1752(a)(1) for his participation in the events on January 6, 2021. On that day, he attended the "Stop the Steal" rally where he listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right.[1]" So Mr. Horning, along with thousands of other individuals attending the rally, walked over to the Capitol building and entered inside. While inside, Mr. Horning was not violent or aggressive towards officers.[2]

---

[1] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[2] The government in its sentencing memorandums on misdemeanor cases has been trying to underscore this factor by arguing that if there was any violence or aggression, there would be more serious charges. However, this point is relevant for misdemeanor sentencings as the government forgets its prior charging decisions where there were misdemeanor defendants that allegedly displayed assaultive or aggressive behavior. [2] *See United States v. Jacob Wiedrich*, 21-CR-581 (TFH) (two months' home detention imposed as defendant was young, did well on pre-trial supervision, and had no criminal history);

# ARGUMENT

## I. Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United States*, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing. Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a). Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. §3553(a).

## II. Imposing a Brief Period of Incarceration is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

### a. Mr. Horning's Personal History and Characteristics

---

*United States v. Jordan Stotts*, 21-CR-272 (TJK) (court imposed two months' home detention despite Stotts allegedly shouting at police and scaling wall to gain access to Capitol). *See United States v. Bradley Rukstales*, 21-CR-041 (CJN) (defendant sentenced to 30 days' incarceration after government alleged he threw a chair in the direction of police officers who had been forced to retreat and was ultimately dragged out of building after resisting their efforts).

Mr. Horning was born and grew up in rural Ohio, where he still currently resides on a farm he likes to call "Hippie Acres." Mr. Horning's parents divorced when he was just a baby and he grew up with his mother and without his biological father, who joined the US Army. Mr. Horning reunited with his biological father when he was 26 years old and they now share a close relationship. Unfortunately, Mr. Horning was subject to physical abuse at the hands of his mother's significant others at a very young age. He also observed domestic violence between these individuals and his mother. Even though he was under the age of 5 when this abuse occurred, he recalls the memories vividly – which still haunt him to this day. His mother re-married shortly thereafter and so Mr. Horning grew up with a step-father and several siblings and half-siblings.

Mr. Horning grew up in a rough neighborhood that was infested with drugs and where much of the population struggled with substance abuse, including his own family. Mr. Horning remembers trying alcohol at the young age of 6 as all of the adults in his life were using alcohol frequently around him during his childhood. Sadly, he tried psychedelics when he was only 10 years old and crack/cocaine when he was only 14 years old. As a result of his environment, Mr. Horning developed some behavioral issues in his childhood and adolescence.

When Mr. Horning was a young teen, he developed a passion for martial arts, which was an outlet for a lot of his frustration. He also played soccer and competed in wrestling and boxing. Mr. Horning did not finish high school, however he obtained his G.E.D. in 1994 and took some college courses. Mr. Horning went on to

4

be gainfully employed as a professional mixed martial arts fighter while also working for several car dealerships over the years. He eventually obtained his contractor's license as well as a professional boxing license.

In 2020, when the national pandemic caused many to lose their jobs, Mr. Horning was laid off from his position at a car dealership, despite having a 15 year history of successfully climbing the ladder as a talented car salesmen. Mr. Horning was unemployed at the time of the instant offense. After being arrested for the instant matter, he could not get a job and was turned away quickly from employers after they learned of his pending charges. In November of 2021, Mr. Horning took the initiative and started his own consulting construction business. Thankfully, Mr. Horning had success and was able to pay his bills and keep his family afloat during a tough time. Mr. Horning has been working tirelessly in the past two years to maintain this business and to provide for his family.

Mr. Horning is in a long term relationship and he has three children and two step-children. He has always had a great relationship with his children and treats his step children as if they were his own. Mr. Horning's biological children are young adults, with his youngest daughter being 19, his son being 21, and his oldest daughter being 22 years old. Mr. Horning's step children are 25 years old and 16 years old. He has been in his youngest step-child's life since she was just 2 years old. After separating from his ex-wife, Mr. Horning stepped up and took care of the children with the help of his family and without the assistance of their mother for several years.  Mr. Horning has given everything to his children and lives for them.

His son struggled with Asperger's all of his life and periodically experienced seizures as a result. Mr. Horning was always there for his son and attended to all of his special needs. Now, his only goal is to work and to spend time with his family. Mr. Horning just became a grandfather and is the proud father of two puppies.



### b. Nature and Circumstances of the Offense

When Mr. Horning decided to attend the rally in DC on January 6, 2021, he was not part of any organized group, did not engage in any pre-planning, and was with his cousin, Jacob Hiles.³ Rather, he went at a time he was unemployed due to the pandemic to mostly protest the marijuana laws in America. He was not a political activist. Wearing a winter construction jumpsuit and an orange winter hat, Mr. Horning attended the rally and heard Republican leaders, including Former

---

³ Jacob Hiles was given a plea to the lesser offense, Parading and Picketing in violation of 40 U.S.C. §5104(e)(2)(G) and was sentenced to 24 months' probation. *See United States v. Hiles*, 21-cr-155 (ABJ).

President Trump, encourage the crowd to make their voices be heard so that an illegitimate President did not get elected. Former President Trump himself encouraged the crowd to go down to the Capitol building and assured them that he would join them there.[4] Mr. Horning did not know what to expect when he arrived at the Capitol building and originally thought it was just going to be a protest on the grounds. He had no prior intentions of entering the Capitol building without permission. Mr. Horning saw hundreds of people entering through an open door on the Upper West Terrace at approximately 2:45 p.m. At the front of that door, there was a man waving people inside.[5] Mr. Horning followed and also entered.



When he entered the building, he did not see any law enforcement and just saw people ahead of him entering another door. He calmly followed.

---

[4] According to testimony from the House of Representatives January 6th Committee, Former President Trump tried to go to the Capitol building after the rally but was re-directed by his security staff. What Donald Trump Limo Video on Jan. 6 Reveals (newsweek.com)

[5] Little did Mr. Horning know that approximately 6 minutes earlier, there were law enforcement officers at that door trying to reason with individuals to leave. However, these officers made a personal strategy call for their safety to not resist these individuals and fell back inside the Capitol. As a result, this door was unmanned by officers and wide open.



After Mr. Horning entered the building, he did not go far and did not stay inside for long. While inside, he had no confrontation with police officers and at one point walked by them not being told to leave.



Less than 10 minutes after he entered, he is seen heading towards the Senate Wing Door exit. There was a large crowd there, some of which were entering and some of which were trying to exit. Rather than fight to push his way through the large crowd, he turned back the way he came.



Very shortly thereafter, Mr. Horning found an exit at the Hall of Columns and calmly walked out, and even raised his hand to his chest to show respect for the officers on his way out. Mr. Horning was in the building for 17 minutes.



While inside the building, Mr. Horning never shouted at officers, never disobeyed their commands, and did not enter into any sensitive areas.

In the days following January 6, 2021, Mr. Horning said some regrettable things on social media and via text to friends. He lied about being next to Ashli

9

Babbit when she was shot – as he obviously was nowhere near that location while he was inside of the building. In response to much harassment for his involvement in the events on January 6, 2021, Mr. Horning lashed out on social media to try to defend himself from some pretty awful comments he was receiving. To be provocative, Mr. Horning responded to another person antagonizing him for his involvement, telling him that he went to DC to "be there when history happens, participate in anarchy, to smoke weed in government buildings…the real reason was to intimidate Congress….they have a 9% approval rating." Mr. Horning's words about intimidating Congress was not representative of his actual actions on January 6, 2021. In fact, he was not intimidating at all when he was inside the building. Mr. Horning's comments on social media were very short lived and were a desperate attempt to defend himself and lash out against those who were describing him as some sort of terrorist. Notably, these comments were made at a time when Mr. Horning did not understand the full extent of what occurred on January 6, 2021.

On February 26, 2021, the FBI executed a search warrant at his residence bringing an entire SWAT team to his house at 6:00 a.m. Although there was no indication he would not be cooperative with law enforcement, the FBI chose this aggressive and unnecessary approach which completely humiliated and scared Mr. Horning and his family. When the FBI arrived, they used a megaphone to announce their presence and demanded that Mr. Horning come out of his residence with his

10

hands in the air – to which he did with no incident. Mr. Horning still relives the stress and embarrassment of that day.

Ever since the comments he made before and on January 12, 2021, Mr. Horning distanced himself entirely from the events on January 6, 2021, and instead re-focused on his family and trying to find employment. Unfortunately, after the media attention he received from his local community, he was "unhireable." He had no choice but to start his own business to support his family – which he did – and which he focused all of his time and attention on in the past two years.

Mr. Horning is a valued asset to his community and to his family. His aunt describes him as "a big hearted person who would give the shirt off his back," and his daughter Emille explains that "he's always been there for me and puts my needs first." His friend Rob describes Mr. Horning as someone who "has a deep desire to be successful and to contribute," and who has selflessly donated his time to him without expecting anything in return. *See* Exhibit 1, Letters of support.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Mr. Horning has already been deterred after the harsh collateral consequences he has experienced as a result of his conduct. He has served jail time in the past but in the last two years has experienced punishment far worse than any jail time. In his local small rural town in Ohio, he has been shunned by many of his peers and has been rejected by employers based on his charges, all of which has been on display for his family and his children to see. Mr. Horning is a 46 year old

man who has had many struggles in life that he has overcome, however he has never had to struggle through the shame and embarrassment that this incident has brought to him and his family. He has never struggled to find employment in his life and was always a sought after car salesman – moving forward to obtain better opportunities for 15 years. All of a sudden, he was "unhireable" and was being called a terrorist in his local community. Thankfully, Mr. Horning was able to rise above and start his own business, however the emotional pain is still with him. In fact, that pain has caused him much mental anguish over the past two years. So much so, that he is currently seeking mental health counseling on his own volition. There is no purpose that excessive jail time could possibly serve in this case given the punishment he has already received. As the DC district court has already recognized, there are many ways someone can be punished, other than a jail sentence.

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.
>
> Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 29.

A short period of incarceration followed by no supervision reflects the serious nature of his conduct but also reflects the fact that he has already served two years of supervision. Besides a couple missed telephone check-ins, Mr. Horning has been compliant with his pre-trial release conditions.

Mr. Horning's recommended sentence is consistent with past cases where similar sentences were imposed.[6] Notably, his alleged conduct is very similar to many other past defendants who entered guilty pleas to the petty offense, Parading and Picketing, in violation of 40 U.S.C. §5104 (e)(2)(G).

- *US v. Jacob Hiles*, 21-cr-155 (ABJ). The Court sentenced Mr. Horning's cousin to 24 months' probation after he entered a plea to 40 U.S.C. §5104 (e)(2)(G). Undersigned counsel understands the mitigating circumstances in the *Hiles* matter. However, when looking at the conduct on January 6, 2021, the two matters are very similar. In fact, Mr. Hiles arguably had more serious conduct in that he wore goggles – allegedly saying he had been tear gassed for an hour before entering and took a video of some of the chaos that was occurring before entering the building and telling an officer at one point that "You can't keep doing this forever."

- *US v. Ryan Suleski*, 21-cr-376 (RDM): Mr. Suleski was sentenced to 60 days' incarceration with no supervision to follow after also pleading guilty to 18 U.S.C. §1752(a)(1). Mr. Suleski also entered a guilty plea to misdemeanor theft after taking papers from the Capitol building. While Mr. Suleski's conduct on January 6 was more aggravating than

---

[6] This case analysis is not meant to suggest that the defense believes incarceration is appropriate in these matters or that the involved allegations were in fact true as undersigned counsel was not counsel in all of these cases. Rather, the analysis is meant to provide a summary of past cases that are relevant for the Court's consideration in this matter.

Mr. Horning's conduct, it is an example of a case where the Court agreed not to impose supervised release following his sentence. The Court agreed because the defendant wished to move to Australia to start a new life based on extenuating circumstances. Although Mr. Horning has no plans of moving abroad, he respectfully requests that the Court consider his past two years of supervision, which is essentially the length of probation imposed in the *Hiles* matter.

- *US v. John Lolos,* 21-cr-243 (APM): Mr. Lolos was sentenced to 14 days' incarceration with no supervision to follow after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G).[7] The government accused Mr. Lolos of making troubling statements and posts while in the Capitol building where he remained for 43 minutes. The government also alleged that after leaving the Capitol building, Mr. Lolos posted a video to twitter shouting "They left! We did it!" Unlike Mr. Horning, the government also accused Mr. Lolos of chanting at police officers while inside the Capitol and causing disruption on his plane ride back home –resulting in the plane having to turn around. Mr. Lolos also had some criminal history.

---

[7] In the cases with petty offenses, the DC District Court is divided on the legality of imposing a split sentence, however many have insisted it is not lawful. *See U.S. v. Marcos Panayiotou*, 22-cr-55 (DLF), ECF No. 33, Memorandum Opinion. This issue is currently on appeal in *U.S. v. Little*, 590 F. Supp. 3d 350 (D.D.C. 2022) (RCL). Regardless of the legality of the split sentence, several courts have imposed brief periods of incarceration followed by no supervision, which is what the recommended sentence is in this matter.

14

- *US v. David Mish,* 21-cr-112 (CJN): Sentenced to 30 days' incarceration with no supervision to follow after pleading guilty to 40 U.S.C. §5104 (e)(2)(G). Mr. Mish witnessed the Ashli Babbit shooting and was close to the Speaker's lobby, however had no confrontations with officers. He also had an old criminal history and distanced himself from the events of January 6, 2021 when he returned to Wisconsin, calling the FBI himself to discuss his involvement.

- *US v. Joshua Wagner*, 21-cr-310 (ABJ): The Court rejected the government's request for a split sentence and sentenced Mr. Wagner to 30 days' incarceration with no supervision to follow. Mr. Wagner entered the Capitol building through a broken window at the Senate Wing Door. While inside the Capitol building, Mr. Wagner allegedly disregarded officer commands and encouraged others to "hold their positions." He also allegedly questioned as to why nobody brought weapons, saying "we could literally take it over right now."

- *US v. Russell Peterson*, 21-cr- 209 (ABJ): Sentenced to 30 days' incarceration with no supervision to follow after pleading guilty to 40 U.S.C. §5104 (e)(2)(G). Mr. Peterson allegedly stood next to rioters that were pushing and shoving law enforcement and continued to enter the building through the Senate Wing Door. He also allegedly live streamed his activity saying, "We took the Capitol. The Capitol is ours now."

- *US v. Mark Simon*, 21-cr-067 (ABJ): Defendant sentenced to 35 days' incarceration with no supervision to follow after he pled guilty to 40 U.S.C. §5104 (e)(2)(G). Mr. Simon allegedly entered the Capitol building through the Rotunda east doors while officers tried to remove people from the building and rioters were pushing against them. Mr. Simon also allegedly took a video of his activities where in the video an alarm is blaring in the background. Mr. Simon also had a criminal history.

- *US v. Andrew Wrigley*, 21-cr-042 (ABJ): Defendant sentenced to 18 months' probation after he pled guilty to 40 U.S.C. §5104 (e)(2)(G). Mr. Wrigley entered the Capitol building through the same door as Mr. Horning, entering 7 minutes earlier than him. However, Mr. Wrigley was not in the Capitol building for very long because there were officers there at the time he entered and they were telling people they were not supposed to be inside.

- *US v. Vukich and Peretta,* 21-cr-539 (TSC): Defendants sentenced to 30 days' incarceration with no supervision to follow after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). Vukish and Peretta were accused of taking paperwork off the floor while walking through the Capitol building. These defendants were also have alleged to have made some unfortunate statements while in the building and afterwards.

Lastly, general deterrence would be served by the recommended sentence. With the advancements in social media and particular media scrutiny surrounding the January 6 cases, the whole world has already seen the harsh collateral consequences that have resulted for similarly situated misdemeanants. Furthermore, empirical evidence proves that the certainty of prosecution, rather than the severity of the punishment is the greater deterrent.[8]

## CONCLUSION

For the reasons stated above, Mr. Horning respectfully requests that the Court impose a brief period of incarceration with no supervision to follow.  Mr. Horning also requests that a fine not be imposed in light of his restitution obligation.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org

---

[8] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

17