**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-275 (ABJ)** |
| **v.** | : | |
| | : | |
| **JAMES MATTHEW HORNING** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew Horning to sixty days incarceration, twelve months' supervised release, sixty hours of community service, and $500 in restitution.

I.     **Introduction**

Defendant James Matthew Horning, 46 years old and the owner of a construction consulting company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 6, 2022, (ECF No. 37 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Horning pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1). As explained herein, a sentence of incarceration is appropriate in this case because Horning: (1) went to Washington D.C. on January 6 with the stated purpose of intimidating Congress; (2) bragged about smoking marijuana inside the U.S. Capitol building on January 6; (3) climbed the exterior scaffolding on the West Front of the Capitol Building; and (4) displayed a complete lack of remorse regarding the events on January 6 and indicated he was proud to have been there.

The Court must also consider that Horning's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Horning's crime support a sentence of sixty days incarceration in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 37 (Statement of Offense), at 1-7.

### *Horning's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Horning received a text message from another individual who stated: "It only takes one person to make a change you know?" Horning replied, "Thank you . . .but its hard to do either. This is a revolution."

On January 6, 2021, Horning traveled to Washington, D.C., from his home in Ohio to participate in the "Stop the Steal" rally against the results of the 2020 Presidential Election.

Once in the District of Columbia, Horning met with his cousin from Virginia Beach, Jacob Hiles, charged separately in case number 21-CR-275 (ABJ). Hiles and Horning proceeded to the West Lawn of the U.S. Capitol.

Horning and Hiles arrived at the base of the inaugural stage scaffolding and Horning smoked marijuana on the Capitol grounds surrounded by other rioters, some of whom were screaming. See Exhibit 1. Horning and Hiles then climbed the scaffolding. A video recorded by Hiles shows him and Horning atop a scaffolding on the west side of the U.S. Capitol. See Exhibit 2. Horning and Hiles then proceeded from the scaffolding to the Upper West Terrace, where they entered the Capitol Building through the Upper West Terrace Door. That door had been first breached at approximately 2:33 pm when rioters already inside the Capitol Building opened the door from the inside. Police attempted to stop the flow of rioters into the building through the door for several minutes, but at approximately 2:44 p.m., officers had to retreat as the crowd advanced.

At approximately 2:45 pm, Horning (circled in yellow below) and Hiles descended a set of stairs leading from the scaffolding on the west side of the Capitol complex to the Upper West Terrace of the Capitol Building. A line of police officers faced them as they approached the Capitol Building  As a result, their movements were captured by body-worn camera as shown in the image below.



Shortly thereafter, Horning and Hiles entered the U.S. Capitol through the Upper West Terrace Door.



From there, Horning and Hiles made their way to the Great Rotunda, where they remained from approximately 2:46 p.m. to 2:48 p.m. They walked to the Senate Wing Door at approximately 2:50 p.m. and remained inside the building at that location for several minutes. During that time, Horning and Hiles chanted along with the crowd and smoked an unknown substance. Horning later posted on his Facebook account that he had smoked marijuana inside the Capitol (referenced below).



At 3:00 p.m., Horning and Hiles walked through the Crypt, and at approximately 3:01 p.m., they exited the Capitol Building through the House Wing Door, having spent around 15 minutes inside.

*Social Media Posts*

As noted above, Horning made a number of posts on Facebook relating to his participation in the riot on January 6, 2021. The Government received these screenshots shortly after January 6, 2021. Horning's Facebook account was deleted afterwards.

Horning bragged on his Facebook account that he had smoked marijuana inside the Capitol Building.



Horning also posted to Facebook, "To anyone on my list who has a problem with what happened in DC today. I am damn proud I was there. If you have a problem with that, hit the inbox if you want. or use the unfriend feature if you ain't bout it. Those of you calling for an investigation, why don't you try investigating deez nuts with ya chin".



After the attack on the Capitol, Horning admitted that his purpose in traveling to Washington, D.C., and attending the Stop the Steal rally was to intimidate Congress. Horning stated, "The real reason was to intimidate congress . . . they have a 9% approval rating. We accomplished that. Maybe they will work on that because they know we could have got them and have mercy."



<em>The Charges and Plea Agreement</em>

On February 24, 2021, the United States charged Horning by criminal complaint with violating 18 U.S.C. 1752(a)(1). On February 26, 2021,  FBI agents arrested him in Ohio. On April 2, 2021, a federal grand jury sitting in Washington, D.C.  indicted Horning on five counts: (1) Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. § 1512(c)(2) and (2); (2) Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); (3) Disorderly and Disruptive Conduct in a Restricted Building or

Grounds in violation of 18 U.S.C. § 1752(a)(2); (4) Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and (5) Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). Eighteen months after he was indicted, Horning pleaded guilty on October 6, 2022, pursuant to a plea agreement, to Count 2 of the Indictment charging him with a violation of 18 U.S.C. 1752(a)(1). In that plea agreement, Horning agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Horning now faces a sentencing on a single count of violating 18 U.S.C. 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Horning faces up to six months of imprisonment and a fine of up to $5,000. Horning must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Cordon's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristic (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 36.

The U.S. Probation Office calculated Horning's criminal history as a category I. Although accurate, that does not account for Horning's five prior convictions, one for assault, that were too old to generate criminal history points, and a recent conviction for marijuana possession for an arrest that occurred after he was charged in this case. PSR at ¶¶ 38-53. Accordingly, Probation calculated Horning's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 138. Horning's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

#### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of sixty days incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Horning's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Horning, the absence of violent or destructive acts is not a mitigating factor. Had Horning engaged in such conduct, he or she would have faced additional criminal charges.

Horning entered the U.S. Capitol building by climbing up the scaffolding on the west side to access the Upper West Side Terrace. This method of entry was obviously illegal and designed to circumvent the various safeguards (i.e. bike rack barriers, lines of police officers, etc.) in place to protect lawmakers and their staff.

Horning displayed a blatant disdain for the rule of law and peaceful transfer of power when he smoked marijuana inside the U.S. Capitol building and bragged about it on Facebook. It also underscores his cavalier attitude toward the violence and destruction that was happening around him on January 6, 2021.

Horning's text message on January 5 made clear that he was expecting a "revolution." Even after witnessing the events on January 6, Horning displayed a complete lack of remorse for his actions. His social media posts after January 6, show no self-realization that he had contributed to one of the worst attacks on democracy in American history. He indicated that he was proud of his participation, crudely derided any potential investigation of the various criminal acts that occurred, and confirmed that his intent was to "intimidate Congress."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Horning

Horning reported to the PSR that since November 2021, he has owned and operated A1 Estimators Plus, LLC.

As set forth in the PSR, Matthew Horning's post-2000 criminal history consists of a misdemeanor conviction for Operating a Vehicle while Intoxicated (Alcohol and/or Drugs) in 2007, a misdemeanor conviction for Disorderly Conduct in 2007, and a conviction for Possession of Marijuana in 2022.  ECF 39 ¶¶ 41-43.

Notably, Horning has not been fully compliant with his conditions of pre-trial release. He was convicted of unlawfully possessing marijuana on October 3, 2022.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

12

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Horning's text messages on January 5th, actions on January 6th, and statements on social media shortly afterwards clearly demonstrate the need for specific deterrence. Horning's text on January 5, 2021 called for "revolution." The next day, he breached the police line, climbed up the scaffolding on the west side of the U.S. Capitol, and entered through the Upper West Terrace Door. He walked through the Crypt and then exited through the House Wing Door. Even after witnessing the chaos and destruction on that day, Horning displayed no remorse for his actions or appreciation for their consequences. Horning posted, "To anyone on my list who has a problem with what happened in DC today .. I am damn proud I was there" and "Those of you calling for an investigation, why don't you try investigating deez nuts with ya chin." Horning also openly admitted his purpose in storming the Capitol was to intimidate Congress. Without a doubt, Horning

had no regrets regarding his actions at the U.S. Capitol Building on January 6 or even in the days following. Possibly, his only remorse in the days after the fatal riot was his documentation and announcement of his participation in the riot via Facebook, which he promptly deleted to avoid law enforcement detection.

The government acknowledges that Horning accepted responsibility by entering into a plea agreement. However, this contrition contrasts with Horning's statements and activity during and following January 6, 2021.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Horning based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Horning has pleaded guilty to a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully

---

[2] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Reed*, 1:21-CR-204 (BAH), the defendant posted on Facebook prior to January 6 warning that there would be "anarchy" and "rebellion" if the results of the 2020 presidential election were not "overturned." On January 6, 2021, Reed used a bike rack fencing as a ladder to climb on to the Northwest Stairs before proceeding into the U.S. Capitol Building. Reed also posted and then deleted evidence of his participation in the riot from social media. Like Horning, Reed pled guilty to one count of violating 18 U.S.C. § 1752(a)(1). Chief Judge Howell sentenced Reed to forty-two days of intermittent incarceration as a condition of probation.

16

In *United States v. Schornak*, 1:21-cr-278-1 (BAH), the defendant entered the Capitol building through the Senate Wing Doorway. On and after January 6, Schornak celebrated his criminal conduct on social media. On January 7, 2021, he posted on Facebook, "I will never apologize for what we did, ever." Schornak eventually removed his Facebook posts to avoid detection. He pled guilty to one count of violating 18 U.S.C.§ 1752(a)(1) and Chief Judge Howell sentenced Schonak to twenty-eight days of intermittent incarceration as a condition of probation.

In *United States v. O'Brien*, 1:21-cr-633 (RCL), the defendant live streamed her storming through the Capitol Grounds eventually entering through the Senate Wing doors of the U.S. Capitol Building. O'Brien posted continuously on Facebook about her exploits including making it into Speaker Pelosi's office suite. After January 6, she made statements on Facebook indicating her lack of remorse for her actions. Eventually, she deleted evidence from her Facebook to evade law enforcement. O'Brien pled guilty to one count of violating 18 U.S.C.§ 1752(a)(1). Judge Lamberth sentenced O'Brien to ninety days of incarceration.

In *United States v. John Getsinger*, 1:21-cr-607 (EGS), the defendant entered the Capitol building through the Rotunda doors. While inside the Rotunda, Getsinger smoked marijuana and bragged about it on Facebook. Unlike Horning, Getsinger eventually made his way to a sensitive area of the Capitol, Congressman Kevin McCarthy's Office. He  pled guilty to one count of violating 40 U.S.C. §  5104(e)(2)(G), a Class B misdemeanor and a less serious offense than the offense to which Horning pleaded guilty. Judge Sullivan sentenced Getsinger to sixty days incarceration as a condition of probation and 100 hours of community service.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to   sixty days incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   s/ *Shalin Nohria*
Shalin Nohria
Assistant United States Attorney
D.C. Bar No. 1644392
United States Attorney's Office
601 D St. NW, 6.713
Washington, D.C.,
202-344-5763
shalin.nohria@usdoj.gov

18

## **CERTIFICATE OF SERVICE**

On this 7th day of February 2023 a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>s/ *Shalin Nohria*</u>
Shalin Nohria
Assistant United States Attorney
D.C. Bar No. 1644392
United States Attorney's Office
601 D St. NW, 6.713
Washington, D.C.,
202-344-5763
shalin.nohria@usdoj.gov